# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

EVAN BURKS, by her parents and natural guardians, Rockland Burks and Adrienne Burks, and ROCKLAND BURKS and ADRIENNE BURKS, individually,

Plaintiffs,

v.

ABBOTT LABORATORIES, ABBOTT LABORATORIES ROSS PRODUCTS DIVISION, ABBOTT LABORATORIES, INC., BRISTOL-MYERS SQUIBB COMPANY, and MEAD JOHNSON & CO.,

Defendants.

Civil No. 08-3414 (JRT/JSM)

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

---

Stephen C. Rathke, **LOMMEN, ABDO, COLE, KING & STAGEBERG, P.A.**, 80 South Eighth Street, Suite 2000, Minneapolis, MN 55402; AND Richard H. Taylor, **TAYLOR MARTINO & ZARZAUR**, 51 Saint Joseph Street, Mobile, AL 36601, for plaintiffs.

Jeannine L. Lee, Robert Bennett, Wendy M. Canaday and Sara H. Daggett, **FLYNN GASKINS & BENNETT, LLP**, 333 South Seventh Street, Suite 2900, Minneapolis, MN 55402; and June K. Ghezzi and Melissa B. Hirst, **JONES DAY**, 77 West Wacker Drive, Suite 3500, Chicago, IL 60601, for defendants Abbott Laboratories, Abbott Laboratories Ross Products Division, and Abbott Laboratories, Inc.

Joseph M. Price, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402-3901; and Adam R. Moore, Matthew D. Keenan, and Sarah E. West, **SHOOK HARDY & BACON LLP**, 2555 Grand Boulevard, Kansas City, MO 64108; for defendants Bristol-Myers Squibb Company and Mead Johnson & Co.

Plaintiffs Evan Burks, and Evan's parents Rockland Burks and Adrienne Burks ("parent-plaintiffs") (collectively, "the Burks") brought this action against defendants Abbott Laboratories, Abbott Laboratories Ross Products Division, Abbott Laboratories, Inc. (collectively, "Abbott"), and Bristol-Myers Squibb Company and Mead Johnson & Company (collectively, "Mead") for negligence, strict liability, and breach of warranty relating to Evan's consumption of powdered formula as an infant. Abbott and Mead now separately move to dismiss the Burks' complaint for failure to state a claim. For the reasons discussed below, the Court grants in part and denies in part those motions.

## BACKGROUND

The Burks are residents of Monroe, Louisiana, and purchased and received powdered infant formula manufactured by defendants while in Louisiana. Evan Burks consumed that powdered formula in Louisiana. Defendant Abbott Laboratories (of which Abbott Laboratories Ross Products Division is a division) is incorporated in Illinois and Abbott Laboratories, Inc. is incorporated in Delaware. Defendants Bristol-Myers Squibb Company and Mead Johnson & Company are incorporated in Delaware. Defendants manufacture and sell a variety of commercial products, including selling powdered infant formula in Minnesota.

In June 2006, before Evan was born, Abbott mailed the parent-plaintiffs a quantity of Similac Isomil Advance powdered infant formula. Later that month, the Burks purchased two cans of Enfamil ProSobee Lipil powdered infant formula, which was manufactured by Mead, from a Monroe, Louisiana WalMart store. For twenty-two days

after Evan's birth on June 19, 2006, the parent-plaintiffs fed Evan both the Similac and Enfamil powdered formulas.

On or about July 2, 2006, Evan was admitted to the Neonatal Intensive Care Unit at St. Francis hospital and was diagnosed with neonatal *Enterobacter sakazakii* ("E. sakazakii") meningitis, which eventually caused Evan permanent, severe brain damage. The Food and Drug Administration ("FDA") and the Centers for Disease Control ("CDC") visited the Burks' home two days later to take water samples, check cleanliness, and check refrigerator temperatures. They also removed powdered infant formula from the home for testing. The Burks allege that Evan's illness and consequent brain damage were caused by Evan's ingestion of defendant-manufactured powdered formula that was contaminated by *E. sakazakii* bacteria.

The Burks also allege that *E. sakazakii* contamination is a problem common to all infant formulas. The Burks also allege that defendants are aware of the potential for such contamination and are aware that powdered infant formula "should not be fed to premature infants, neonates (newborns up to one month of age) or infants who might have immune problems." (Third Am. Compl., Docket No. 69, ¶ 24.) Indeed, after testing samples of powdered infant formula taken from U.S. powdered infant formula manufacturing facilities, the Burks allege that the FDA concluded that 23% of those samples contained *E. sakazakii* bacteria. Specifically, the Burks assert that between March 29, 2002, and July 3, 2006, environmental, raw ingredient, and finished product sampling at Abbott's and Mead's powdered formula facilities tested positive for

*E. sakazakii*.  Finally, the Burks contend that powdered infant formula is the sole demonstrated source of neonatal *E. sakazakii* meningitis and that the Similac and Enfamil packages of powdered infant formula contained no warning that the product should not be fed to neonates.

Premised on those allegations, the Burks bring four claims in their Third Amended Complaint ("TAC"), seeking recovery on behalf of minor Evan Burks and for the parent-plaintiffs' damages for loss of consortium.  In Count I, the Burks allege that defendants are strictly liable for their injuries and damages.  In Count II, the Burks allege that defendants were negligent in the preparation, design, testing, and manufacture of their powdered infant formula and negligently failed to warn physicians and consumers of the potential risks involved with feeding powdered infant formula to neonates.  In Count III, the Burks allege that defendants breached implied warranties of merchantability and fitness for a particular purpose.  Finally, in Count IV, the Burks bring an action under the Louisiana Products Liability Act ("LPLA"), the Louisiana state law's exclusive theory of recovery in products liability cases.  Abbott and Mead now separately move to dismiss those claims under Federal Rule of Civil Procedure 12(b)(6).

**DISCUSSION**

## I.     CHOICE OF LAW

### A.     Actual Conflict

The parties dispute whether Minnesota or Louisiana substantive products liability law applies in this case.  In a diversity case, the Court applies the forum state's choice-of-law rules.  *N.W. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386, 1393 (8th Cir. 1997).  Because Minnesota's choice-of-law rules apply here, the Court must first consider "whether the choice of one state's law over another creates an actual conflict." *Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 469 (Minn. 1994).  "A conflict exists if the choice of one forum's law over the other will determine the outcome of the case." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000).

Louisiana has adopted the LPLA, which provides the exclusive statutory remedies for "damage proximately caused by a characteristic of the product that renders the product **unreasonably dangerous** when such damage arose from a reasonably anticipated use of the product."  La. Rev. Stat. § 9:2800.54(A) (emphasis added).  The LPLA limits recovery to damage caused by products that are "unreasonably dangerous" because of (1) the products' construction or composition, (2) the products' design, (3) an inadequate warning, or (4) the products' failure to conform to a manufacturer's express warranty.  *Id.* § 9:2800.54(B)(1)-(4).  As a consequence of this statutory limitation, Louisiana courts have held that independent products liability claims (outside of claims premised on the LPLA) for strict liability, negligence, and breach of implied warranty are

- 5 -

no longer viable theories of recovery under Louisiana law. *See, e.g.*, *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1251 (5th Cir. 1996). By contrast, Minnesota recognizes common law claims for strict liability, negligence, and breach of implied warranty.

Defendants argue that there is a conflict between Minnesota and Louisiana product liability laws because the states' laws vary regarding substantive causes of action, elements of the causes of action, and available remedies. Despite the fact that Louisiana applies statutory products liability law and that Minnesota applies common law, the Burks argue that there is no actual conflict between the LPLA and Minnesota common law. Specifically, the Burks contend that Minnesota products liability law recognizes all claims that could be made under the LPLA.

As noted by defendants, however, the Burks argument does not conclusively resolve whether there is an actual conflict. Indeed, the LPLA may be **narrower** than Minnesota common law because the LPLA places significant emphasis on the "unreasonably dangerous" element, which is not required under Minnesota common law. The question, therefore, is whether selection of one state's law over the other will determine the outcome of the Burks' claims. Based on that inquiry, the Court concludes that there is an actual conflict between the states' laws.

First, it is clear that the two states differ with respect to the availability of some of the Burks' substantive claims. For example, the parent-plaintiffs assert claims for loss of consortium in the TAC. Although Louisiana permits parental loss-of-consortium claims,

*see Clavier v. Roberts*, 783 So. 2d 599, 611 (La. App. 3d Cir. 2001), Minnesota law does not permit parents to recover for loss of consortium of a minor child, *Father A. v. Moran*, 469 N.W.2d 503, 506 (Minn. Ct. App. 1991).  Moreover, as to the Burks' claims that defendants were negligent in testing and advertising the powdered infant formula, Minnesota allows claims for such negligence, *see Goeb v. Theraldson*, 615 N.W.2d 800, 818 (Minn. 2000), but Louisiana law does not permit those claims, *Cantu v. C.B. Fleet Holding Co., Inc.*, No. 2:06 CV 2168, 2007 WL 689566, at *2 (W.D. La. Mar. 1, 2007).

Further, there is a conflict between the laws of the two states regarding the remedies that are available to plaintiffs in tort claims.  Under Louisiana law, punitive damages are only available if expressly authorized by statute.  *Mosing v. Domas*, 830 So. 2d 967, 973 (La. 2002).  The LPLA, however, does not authorize the award of punitive damages.  Thus, an aggrieved party may not recover punitive damages in an action brought under the LPLA.  *See New Orleans Assets, L.L.C. v. Carl E. Woodward, L.L.C.*, 278 F. Supp. 2d 776, 781 n.1 (E.D. La. 2003); *see also Truxillo v. Johnson & Johnson*, No. 07-2883, 2007 WL 1853363, at *4 (E.D. La. June 27, 2007).  Minnesota law, however, permits an award of punitive damages in a tort action where "clear and convincing" evidence establishes that a defendant acted with "deliberate disregard for the rights or safety of others."  Minn. Stat. § 549.20.  Because a substantial remedy, punitive damages, is available under Minnesota law but not under Louisiana law, there is therefore a clear conflict between the states' laws.  *See Nodak*, 604 N.W.2d at 94 (finding that an actual conflict of law existed where "[u]nder Minnesota law an insurer may not recover

no-fault benefits paid to its insured due to an out-of-state accident unless the insured received or will receive a double recovery . . . [but] it is undisputed that on the present facts North Dakota law allows insurers to seek recovery of no-fault benefits payments through equitable allocation").

In sum, there is an actual conflict between Louisiana statutory products liability law and Minnesota common law.

**B.      Constitutional Permissibility and Significant Contacts**

Where an actual conflict between states' laws exists, the Court's second step is to determine if the law of both states may be constitutionally applied to the case. *Jepson*, 513 N.W.2d at 469. The United States Supreme Court has held that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that a choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981). Here, it is highly questionable that it would be constitutionally permissible to apply Minnesota law to this case. The powdered infant formula was purchased in or delivered to Louisiana, Evan Burks consumed the formula in Louisiana, Evan Burks' injury and diagnosis occurred in Louisiana, and plaintiffs were and are residents of Louisiana. Indeed, the only contact that Minnesota has with this case is that defendants both transact business in Minnesota.

Even assuming that it would be constitutionally permissible to apply Minnesota law, the Court must evaluate five factors to determine **which** state law should apply.

*Nodak*, 604 N.W.2d at 94. Those factors include: "(1) predictability of the result; (2) maintenance of interstate order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." *Jepson*, 513 N.W.2d 470. Minnesota courts have indicated that the first[1] and third factors have little value in tort cases, *see id.* at 470-72, and the fifth factor does not appear to carry much weight in a choice-of-law analysis, *id.* at 473 ("Sometimes different laws are neither better nor worse in an objective way, just different."); *see also Nodak*, 604 N.W.2d at 96 ("[T]his court has not placed any emphasis on this [better rule of law] factor in nearly 20 years.").

In considering the second factor, maintenance of interstate order, the Court assesses whether the application of Minnesota law would "manifest disrespect" for Louisiana's sovereignty. *Jepson*, 513, N.W.2d at 471. The Eighth Circuit has held that where a state "has little or no contact with a case and nearly all of the significant contacts are with a sister state, the factor suggests that a state should not apply its own law to the dispute." *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620-21 (8th Cir. 2001). Indeed, in *Hughes*, the Eighth Circuit determined that Louisiana law should apply in a products liability action where the defendant's principal place of business was in Arkansas, but where the product at issue was purchased in Louisiana, the injury occurred in Louisiana, and the plaintiff was a Louisiana resident. Despite *Hughes*'s conclusions on a similar

---

[1] "Predictability of results applies primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." *Myers v. Gov't Employees Ins. Co.*, 225 N.W.2d 238, 242 (Minn. 1974).

fact pattern, the Burks maintain that the law of the state in which the formula was manufactured, which remains unknown, should be the applicable law. However, as noted above, Louisiana has an overwhelming number of contacts with the case regardless of where the formula was manufactured (which would likely be the only contact that state had with this case, assuming the formula was not manufactured in Louisiana), and the second factor therefore weighs in favor of applying Louisiana law.

Under the fourth factor, the Court considers "which choice of law most advances a significant interest of the forum." *Jepson*, 513 N.W.2d at 471. "When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, . . . clearly the law of the interested state should be applied." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 590 N.W.2d 670, 674 (Minn. Ct. App. 1999) (internal quotation marks omitted). In these circumstances, Louisiana clearly has a strong interest in having the rights of its citizens adjudicated with its own law when injuries occur in or tort actions arise from events within Louisiana's borders. Conversely, Minnesota would have very little, if any, interest in adjudicating those rights on these facts. Thus, the fourth factor also weighs in favor of applying Louisiana law.

The balance of relevant factors clearly favors the application of Louisiana's substantive law, the LPLA. Further, even if the choice-of-law analysis did not favor either state's law, "the state where the accident occurred has the strongest governmental interest; [and] accordingly, the law of the state where the accident occurred should be applied." *Nodak*, 604 N.W.2d at 96. Here, the plaintiffs allege that the harm occurred

exclusively in Louisiana, that Evan ingested the powdered formula in Louisiana, and that Evan was diagnosed with *E. sakazakii* meningitis in Louisiana. Thus, under Minnesota Supreme Court precedent, in these circumstances Louisiana's governmental interest dictates that this Court apply Louisiana substantive law.

The Burks contend that a choice-of-law analysis is premature, in large part because discovery has not yet revealed the state of the manufacturing sites that produced the powdered infant formula. However, given the above choice-of-law analysis, the Court is not persuaded that it would come to a different conclusion regardless of where the manufacturing sites are located. In short, Louisiana has an overwhelming number of contacts with this case and a persuasive governmental interest in having its law applied to these claims. In the view of the Court, this is not a close call. Accordingly, the Court will apply Louisiana substantive law to the Burks' products liability claims.

## II.    STANDARD OF REVIEW

In reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to plaintiff, the non-moving party. *See, e.g., Bhd. of Maint. of Way Employees v. Burlington N. Santa Fe R.R.,* 270 F.3d 637, 638 (8th Cir. 2001). However, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007). A plaintiff must state "a claim to relief that is plausible on its face." *Id.* at 1974.

## III.   MOTION TO DISMISS

### A.   Failure to State a Claim

As discussed, *supra*, the LPLA "establishes the exclusive theories of liability for manufacturers for damages caused by their products." La. Rev. Stat. § 9:2800.52. That is, "[a] plaintiff may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability not set forth in the LPLA." *Jefferson v. Lead Indus. Ass'n, Inc.*, 930 F. Supp. 241, 244-45 (E.D. La. 1996), *aff'd* 106 F.3d 1245 (5th Cir. 1997) (citing La. Rev. Stat. § 9:2800.52). Specifically, the LPLA provides for manufacturer liability to a claimant for damages "proximately caused" by an "unreasonably dangerous" characteristic of a product. *Jefferson*, 930 F. Supp. at 245. A claimant may show that a product is unreasonably dangerous under four theories: (1) that the product was unreasonably dangerous in construction or composition; (2) that the product was unreasonably dangerous in design; (3) that the product was unreasonably dangerous because of inadequate warnings; or (4) that the product was unreasonably dangerous because of nonconformity to an express warranty. La. Rev. Stat. § 9:2800.54(B)(1)-(4).

Thus, in order for a plaintiff to plead a prima facie LPLA claim, the plaintiff must allege (1) "that the defendant is a manufacturer of the product"; (2) "that the claimant's damage was proximately caused by a characteristic of the product"; (3) "that the characteristic made the product unreasonably dangerous in one of four ways provided by statute"; and (4) "that the claimant's damage arose from a reasonably anticipated use of the product by claimant or someone else." *Jefferson*, 930 F. Supp. at 245.

Defendants now contend that the Burks' claims in Counts I-III should be dismissed for failure to state a claim because the LPLA does not recognize independent causes of action for strict liability, negligence, or breach of warranty. Further, defendants contend that the Burks' claim under the LPLA in Count IV lacks the requisite specificity necessary to withstand a motion to dismiss.

### 1. Counts I-III

In the TAC, the Burks bring a claim for strict liability in Count I; claims for negligence, failure to warn,[2] failure to adequately test the infant formula, and negligent marketing, promotion, advertising, and sale of the powdered formula in Count II; and a claim for breach of implied warranty in Count III. In light of the promulgation of the LPLA, however, it is clear that "[w]hile the statutory ways of establishing that a product is unreasonably dangerous are predicated on principles of strict liability, negligence, or warranty, respectively, neither negligence, strict liability, nor breach of express warranty is any longer viable as an independent theory of recovery against a manufacturer." *Jefferson*, 930 F. Supp. at 245; *see also id.* ("It is apparent from the foregoing discussion of the exclusivity of the LPLA that plaintiff's allegations of negligence, fraud by misrepresentation, market share liability, breach of implied warranty of fitness and civil conspiracy fail to state a claim against the lead paint pigment manufacturers under the LPLA and must therefore be dismissed."). Accordingly, Counts I-III must be dismissed.

---

[2] The Burks's allegations of failure to warn under the LPLA are discussed further, *infra*.

## 2.    Counts IV – Claims Under the LPLA

In Count IV, the Burks bring claims under the LPLA alleging that the defendant-manufactured powdered formula was unreasonably dangerous in composition or design, *see* La. Rev. Stat. § 9:2800.54(B)(1)-(2), unreasonably dangerous by virtue of defendants' failure to warn, *see id.* § 9:2800.54(B)(3), and unreasonably dangerous as a consequence of defendants' breach of express warranty, *see id.* § 9:2800.54(B)(4).  The Court considers each of those claims below.

### a.    Unreasonably Dangerous in Composition or Design

The Burks allege that "[d]efendants' design and/or composition of powdered infant formula renders the products unreasonably dangerous in normal use."  (TAC, Docket No. 69, ¶ 98.)  Under the LPLA, "[a] product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer."  La. Rev. Stat. § 9:2800.55.  The LPLA also provides for manufacturer liability for a product that is unreasonably dangerous in its design if "there existed an alternative design for the product that was capable of preventing the claimant's damage" and the likelihood that the product's design would cause the plaintiff's damages outweigh the burden of adopting the design and the adverse effect of the alternative design on the product's utility.  *Id.* § 9:2800.56.

Defendants contend that the Burks' fail to allege that their products were unreasonably dangerous in composition or design. The parties argue at length about the applicability of a Louisiana Supreme Court case, which addressed how to define "unreasonably dangerous" in the context of a tort action. In *Simeon v. Doe*, the plaintiffs brought wrongful death claims against a restaurant and oyster supplier after a customer fell ill after ingesting raw oysters that contained a naturally occurring bacteria. 618 So. 2d 848, 851 (La. 1993). The customer later died as a result, and the plaintiffs asserted that the defendants were liable for the sale of those raw oysters. The Louisiana Supreme Court concluded, however, that based on the evidence before it, it could not conclude "that raw oysters containing the . . . bacteria are unreasonably dangerous to the ordinary consumer," despite evidence showing that 55-60% of raw oyster contained the bacteria. *Id.* The Court reasoned that raw oysters posed very little threat to healthy people and, notwithstanding the fact that the bacteria posed a threat to those with specific liver or kidney disease, raw oysters were not unreasonably dangerous. *Id.* In short, the Louisiana Supreme Court held that a product is not "unreasonably dangerous simply because it cannot be made entirely safe for all consumption." *Id.* (internal quotation marks omitted).

Even viewing the Burks' factual allegations as true, the Burks fail to allege that the defendant-manufactured powdered formula was unreasonably dangerous to the ordinary consumer in composition. Instead, based solely on the Burks' allegations, it appears that powdered infant formula, even when it contains *E. sakazakii* bacteria, is not

harmful to healthy infants over the age of 30 days old. That is, it appears that only neonates or infants with specific health issues are susceptible to *E. sakazakii* infection.

Moreover, the Burks do not allege that defendants' products deviate in some way from the defendants' or identical products' manufacturing specifications or performance standards. The Burks also do not allege that there is an alternative design for powdered infant formula that would reduce the risk of *E. sakazakii* contamination. Indeed, it seems that within the industry, it is **expected** that powdered formula may be contaminated: the Burks allege that the FDA, which tested samples of powdered infant formulas taken from various formula-manufacturing facilities in March 2004, found that 23% of the samples contained *E. sakazakii* bacteria.

In sum, the Burks have not stated a plausible claim under the LPLA for unreasonably dangerous composition or design, and their claims must be dismissed to the extent the Burks seek to recover on those theories.

### b. Inadequate Warning

The Burks further allege that "[d]efendants failed to adequately warn physicians and consumers that the use of their powdered infant formula for children less than thirty days old is associated with significant health risks; which failure renders the products unreasonably dangerous in normal use." (TAC, Docket No. 69, ¶ 98.) Under the LPLA, a product is unreasonably dangerous for a manufacturer's failure to provide an adequate warning if, "at the time the product left its manufacturer's control, the product possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care

to provide an adequate warning of such characteristic and its danger to users and handlers of the product." La. Rev. Stat. § 9:2800.57. However, a manufacturer need not provide a warning when the product "is not dangerous to an extent beyond that which would be contemplated by the ordinary user or handler of the product, with the ordinary knowledge common to the community as to the product's characteristics." *Id.* Here, the Rule 12(b)(6) analysis must be divided between the two defendants, Abbott and Mead.

### i. Abbott

As to the claims against Abbott, the Burks allege that "[p]rior to August 2006, Abbott provided no warnings concerning powdered infant formula's lack of sterility and that it should not be fed to premature infants or infants who might have immune problems." (TAC, Docket No. 69, ¶ 23.) Abbott argues that the Burks only plead legal conclusions, and not factual allegations, that Abbott inadequately warned plaintiffs of the dangers associated with feeding neonates powdered infant formula. Moreover, Abbott contends that the Burks failed to plead factual allegations that Abbott's powdered formula was, in fact, contaminated with *E. sakazakii* bacteria. Finally, Abbott contends that the Burks' allegation that Abbott failed to warn of nonsterility in their product is baseless, pointing to directions allegedly included in the formula package which warned that powdered infant formula was not sterile and should not be fed to premature infants or infants with immune problems.

Assuming the facts alleged in the TAC as true, *Burlington N. Santa Fe R.R.*, 270 F.3d at 638, the Burks have sufficiently pled a plausible claim against Abbott under the

LPLA for inadequate warning.  *See Twombly*, 127 S. Ct. at 1974.  In addition to the allegation that prior to August 2006, Abbott failed to warn consumers about the danger of feeding some infants powdered formula, the Burks also allege that presently, Abbott's products include such a warning.  (TAC, Docket No. 69, ¶ 22.)  Moreover, the Burks allege that "[t]he source of bacteria that caused [Evan's] neonatal *Enterobacter sakazakii* meningitis was [Abbott-manufactured] Similac Advance powdered infant formula and/or [Mead-manufactured] Enfamil ProSobee Lipil powdered infant formula."  (*Id.*, ¶ 15.)  These facts, and the inferences that may be reasonably drawn from them, are sufficient to survive a motion to dismiss.

Notably, after the hearing on these motions, Abbott and Mead filed motions for leave to supplement the record in connection with their instant motions to dismiss.  Specifically, Abbott and Mead seek to include in the record documentation of the warnings that defendants included in their powdered infant formula packaging and which warned consumers that the products should not be fed to premature infants or infants with immune system problems.

"When considering a motion for judgment on the pleadings (or a motion to dismiss . . .) the court generally must ignore materials outside the pleadings, but it may consider 'some materials that are part of the public record or do not contradict the complaint,' as well as materials that are 'necessarily embraced by the pleadings.'" *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).  As an initial matter, defendants do not provide support for the proposition that these warnings were

included or were the type of warning that would have been included with the powdered formula that Evan Burks consumed. More importantly, these warnings are not necessarily embraced by the pleadings; that is, the Burks do not allege that a specific warning was inadequate, but contend that there was no warning at all. Moreover, the introduction of these warnings into the record expressly contradicts the allegations in the TAC that there were no warnings, and should not be considered in the context of a motion to dismiss. *See Pourous Media*, 186 F.3d at 1079. In short, the warnings produced by defendants are evidence that defendants may produce in preparation for a motion for summary judgment or at trial. At the motion to dismiss stage, however, the Court must consider the facts alleged as true, and the Burks allege that these warnings were not present. Accordingly defendants' motions for leave to supplement the record are denied.

### ii.     Mead

Mead argues that the Burks failed to plead facts that Mead (as opposed to Abbott) provided an inadequate warning to plaintiffs or that such inadequate warning proximately caused the Burks' damages. Indeed, the only mention of Mead in the factual allegations is in paragraph 22 of the TAC, where the Burks concede that presently, Mead provides adequate warnings to consumers regarding the health risks associated with powdered infant formula. (TAC, Docket No. 69, ¶ 22.) The Burks, however, do not allege that Mead, at any time, failed to provide adequate warnings. Instead, the Burks fail to allege beyond a "formulaic recitation of the elements" in the TAC that Mead's product was

unreasonably dangerous for failure to adequately warn consumers.  As a consequence, the Court dismisses the Burks' LPLA claims for inadequate warning against Mead.

### c.    Failure to Conform to Express Warranty

Finally, plaintiffs allege that "[d]efendants breached an express warranty that their powdered infant formula is both safe and effective, and misrepresented the drugs' [sic] unsterile nature, rendering the powdered infant formula unreasonably dangerous in normal use."  (TAC, Docket No. 69, ¶ 98.)

The LPLA provides for manufacturer liability if the product is unreasonably dangerous because it fails to conform to an express warranty provided by the manufacturer.  A product's nonconformance to an express warranty is unreasonably dangerous "if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue."  La. Rev. Stat. § 9:2800.58.  The LPLA defines an express warranty as "a representation, statement of alleged fact or promise about a product or its nature, material or workmanship that represents, affirms or promises that the product or its nature, material or workmanship possesses specified characteristics or qualities or will meet a specified level of performance."  La. Rev. Stat. § 9:2800.53(6).

The Burks, however, have not identified **any** express warranty made by defendants that fits the LPLA's definition of that term.  Furthermore, the Burks do not allege that they relied on any such express warranty, that the infant formula failed to conform to such warranty, or that the failure to conform to an express warranty

proximately caused the Burks' damages. Accordingly, the Burks' claims against both defendants for nonconformance to an express warranty under the LPLA must be dismissed.[3]

Under these circumstances, however, the Court finds it appropriate to dismiss the above claims without prejudice, and grants the Burks leave to file a fourth amended complaint to address the deficiencies in its pleading of claims under the LPLA.

### B.    Statute of Limitations and the Parent-Plaintiffs' Derivative Claims

Parent-plaintiffs Rockland and Adrienne Burks also bring derivative claims under the LPLA for loss of consortium of their minor daughter and lost wages. Defendants contend, however, that the parent-plaintiffs' derivative claims should be dismissed because they are barred by the Louisiana prescriptive period. Where defendants contend that the statute of limitations bars the plaintiff-parents' derivative claims, the Court must first apply Minnesota choice-of-law principles regarding statutes of limitation. Under the Minnesota Uniform Conflict of Laws-Limitations Act ("UCLLA"), "if a claim is substantively based . . . upon the law of one other state, the limitation period of the state applies." Minn. Stat. § 541.31. Thus, where the governing substantive law in this case is Louisiana law, Louisiana's liberative prescription on tort actions will generally apply.

---

[3] Loss of consortium claims are derivative claims that depend on the success of an underlying tort. *Spiegal v. Fireman's Fund. Ins. Co.*, 696 So. 2d 569, 576 (La. 1997). Given the analysis above, the parent-plaintiffs' claims for loss of consortium claim must also be dismissed to the extent they derive from the claims dismissed above.

The Louisiana Civil Code provides that "[d]elictual actions [(those sounding in tort)] are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained." La. Civ. Code. Art. 3492. "Damage is considered to have been sustained . . . only when it has manifested itself with sufficient certainty to support an accrual of a cause of action." *Brown v. R.J. Reynolds Tobacco Co.*, 52 F.3d 524, 527 (5th Cir. 1995).[4]

Here, the Burks allege that the injury to Evan occurred on July 2, 2006, and that a diagnosis of *E. sakazakii* infection and meningitis was made at that time. The Burks, however, did not file their complaint in Minnesota state court until June 9, 2008, nearly two years after Evan allegedly sustained her injuries. Thus, it is clear that under the Louisiana liberative prescription period, the parent-plaintiffs' derivative claims are barred.

The Burks contend, however, that the Minnesota statute of limitations, and not the Louisiana prescriptive period, applies to their derivative claims under an "escape clause" in the UCLLA. That clause states:

> If the court determines that the limitation period of another state applicable under Sections 541.31 and 541.32 is substantially different from the limitation period of this states and has not afforded a fair opportunity to sue . . . the limitation period of this state applies.

---

[4] Louisiana law also dictates that the periods of prescription for a parent's derivative tort claim based on a child's injury run separately from a child's claim. *See Coleman v. Audobon Ins. Co.*, 572 So. 2d 352, 354 (La. Ct. App. 1990).

Minn. Stat. § 541.33.  The Burks first point out that the time for Minnesota's six-year statute of limitations is substantially different from Louisiana's one-year prescriptive period.  Moreover, the Burks argue that they did not have a fair chance to pursue their claims because during the year in which the Louisiana prescriptive period was running, the parent-plaintiffs were dealing with their daughter's medical challenges and searching for a suitable attorney.

As an initial matter, the Court notes that the UCLLA escape clause should "rarely be employed" only in "extreme cases."  Minnesota Uniform Conflict of Laws-Limitations Act, § 4, cmt.  Notably, "[i]t is not enough that the forum state's limitation period is different from that of the state whose substantive law is governing; the difference must be 'substantial,' and the 'fair opportunity' provision constitutes a separate and additional requirement."  *Id.*  Thus, the mere difference between the prescriptive time periods in Minnesota and Louisiana does not constitute a "substantial" difference under the escape clause.

However, the Court cannot conclude at this stage of the litigation that the escape clause should not apply.  In particular, the Court expects that discovery will provide a reasonable factual basis on which the Court may conclude whether the parent-plaintiffs "encountered any kind of substantial barriers to instituting the suit within one year."  *Hall v. Summit Contractors, Inc.*, 158 S.W.3d 185, 189 (Ark. 2004) (addressing the Arkansas Uniform Act's similar statute-of-limitations "escape clause").  Although the mere difference in prescriptive periods may not form the sole grounds on which to argue

substantial differences and fair opportunities to litigate, that disparity may play a role alongside other factual considerations. Accordingly, the Court finds that additional discovery is needed to determine whether the Burks had a fair opportunity to litigate their claims under the Louisiana prescriptive period.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1.  Defendants Abbott Laboratories, Abbott Laboratories Ross Products Division, and Abbott Laboratories, Inc.'s Motion to Dismiss [Docket No. 74] is **GRANTED in part** and **DENIED in part** as follows:

    a.  Abbott's motion is **DENIED** as to the Burks' LPLA claims for inadequate warning.

    b.  Abbott's motion is **DENIED** as to the applicable statute of limitations for the parent-plaintiffs' derivative claims.

    c.  Abbott's motion is **GRANTED** in all other respects. Accordingly, Counts I, II, and III of the Third Amended Complaint are **DISMISSED with prejudice**. To the extent that the Court grants Abbott's motion with respect to the Burks' LPLA claim, Count IV is **DISMISSED without prejudice**.

2.  Defendants Bristol-Meyers Squibb Company and Mead Johnson & Co.'s ("Mead") Motion to Dismiss [Docket No. 79] is **GRANTED.** Accordingly, Counts I, II,

and III of the Third Amended Complaint are **DISMISSED with prejudice**.  Count IV is **DISMISSED without prejudice**.

3.      The Court grants the Burks leave to file a fourth amended complaint to address the deficiencies outlined here.  The fourth amended complaint must be filed within thirty (30) days of the filing of this Order.

4.      Abbott's and Mead's Motions for Leave to Supplement the Record [Docket Nos. 96, 99] are **DENIED**.

DATED:  July 24, 2009                                    ___s/ John R. Tunheim___
at Minneapolis, Minnesota.                                    JOHN R. TUNHEIM
                                                       United States District Judge